A very well presented case on both sides. 2018-60227 Forrest General Hospital v. Alex M. Azar I beg the Court's indulgence. Also, I'd like to cite the language we already quoted in our reply brief from the House Conference Report, because the Court there said, for purposes of federal matching payments reimbursement, FMAP is the acronym there, Section 1115 waivers are deemed to be part of a State's Medicaid plan. But we don't need to rely on the House Conference Report to rule for you, do we? We just need to look at the text of the regulation, right? We need to look at the text of the regulation and its interpretation in the Federal Register. It says, hospitals may include all days attributable to populations eligible for Title XIX matching payments. Now, that's why they try to say, oh, apply the statute literally. These people don't really get matching payments. Well, as the PRRB pointed out correctly, the PRRB majority, nobody, the demonstration population or the care pool, got matching payments because the Feds picked up the entire tab. So there was nothing to match. But again, the Court should notice that matching payments is just, again, the way that the agency says eligible for Medicaid benefits. The Owensboro case, 832F3rd at 622, is interesting because it talks, 621 actually, it's not on the same phrase, matching payments, but it talks about how the agency uses synonyms. Eligible for medical assistance, eligible under a State plan approved under Title XIX, eligible for Medicaid, all the same thing. Same thing here, Your Honor. The Secretary, I should mention in passing, the argument in their brief that these are not benefits because the payments went to the hospitals, the providers. Your Honor, obviously Medicaid payments always go to the providers. A Medicaid beneficiary does not get a check for $5,000 with the instruction, please take this to the hospital. And again, in the very letter itself, it said, in the course of pointing out, excuse me, Your Honor, in the course of pointing out to the State that they need to be careful with their care pool, they expressly said that these payments are on behalf of individuals. That's the first paragraph of the second page of the 2005 letter, Your Honor. Finally, Your Honor, I just have to reiterate that the Secretary's position has been made clear in three Federal Register notices. Those are, I think, the most important authorities that my clients rely on. They have said over and over that they are not going to confine the inclusion of the DISH formula to those who are Medicaid eligible. Rather, they are going to include everybody under a Section 1115 population because they consulted with the experts at Medicaid, consulted extensively with Medicaid staff, who say that 1115 Expansion Waiver Days are utilized by patients whose care is considered to be an approved expenditure under Title XIX. Again, that magic language, approved expenditure under Title XIX, means matching payments, means Medicaid benefits, means what people in the uncompensated care pool received. Your Honor, if the Court has no other questions on any other issues, I will cede my time. Thank you very much, Counsel. We have your argument, and you've saved time for rebuttal. Good morning, Your Honor. Jennifer Utrecht on behalf of HHS. May it please the Court. Your Honor, I'd like to begin by stating that there seems to be a little bit of a misunderstanding about what the history of this DISH adjustment amendment to the Secretary's regulations were. Prior to 2000, the Secretary did not include any patient under an 1115 because the Secretary took a position that the statute required only those that were eligible for Medicaid under the state plan. So that is, the state plan as it exists without any amendment or waiver. In 2005, the Secretary took the position, and this was ratified by Congress, that there were certain expenditures under Medicaid waivers under Section 11 that could be included in the DISH adjustment. And Congress specifically amended the DISH adjustment statute to state that the Secretary may, again, in the Secretary's discretion, decide whether and to what extent expenditures under these Section 11 waivers would be considered Medicaid expenditures and could be included in the adjustment. The Secretary then passed the regulations that have been cited in this brief extensively that say, essentially, there are two types of things under Section 1115 waivers that can be included. You agree that the Secretary has to follow its regulations? Yes, Your Honor. Of course. The regulation states that a patient is deemed eligible for Medicaid, and therefore included in the DISH judgment, only if the patient is eligible for inpatient hospital services under an approved Medicaid plan or under a waiver. And the key language here is eligible for inpatient hospital services under a waiver. What we have faced with here in the Katrina Project were two programs. The first undeniably expanded Medicaid eligibility and made patients eligible for inpatient hospital services under the waiver. This is the portion of the letters and the documents that clearly state that pregnant women and children under a certain income limit are now presumed eligible for Medicaid and are now going to be able to receive inpatient hospital services. The second program was the uncompensated care pool. That did not make any patient eligible for any type of service. What the uncompensated care pool did was it created a pool of money that hospitals could seek reimbursement from if they had uncompensated costs from patients who had no insurance. The creation of the uncompensated care pool simply does not, within the meaning of the regulation, give eligibility to any patient for anything. What it does is it gives hospitals reimbursement for uncompensated costs. And that distinction was drawn not only in the letter, but in the Deficit Reduction Act passed by Congress itself, which appropriated a separate pool of money, separate and apart from Title 19 funds that are ordinarily given to states to pay for Medicaid under both the state plan and under Section 1115 waivers. The portion of our brief that addresses the matching payments, because that was brought up by Plaintiffs' Council, addresses the fact that the Secretary's regulation has a second portion that says that hospitals may also include days for expenditures that were eligible for matching payments. And of course here, with respect to the uncompensated care pool Congress provided in the Deficit Reduction Act, the payments from this pool were not eligible for matching payments, and so of course they do not fall within this second portion of the regulation either. So again, the key distinction here is patient days are only included within the dish adjustment if a patient under the Secretary's regulations, if a patient is eligible for inpatient hospital services under the waiver. That was not done here. The uncompensated care pool, by definition, could only be paid out if patients did not have insurance or including Medicaid. But it doesn't say that. It says for those evacuees receiving medical assistance under the project for total uncompensated care costs incurred for medically necessary services. It doesn't say that it's only for the inpatient. So they're included if they were part of the demonstration project, which this demonstration project was absolutely included. I'm sorry, Your Honor, could you repeat the quote for me? I'm reading B, the portion of the DRA, B, with respect to evacuees who do not have other coverage for such assistance through insurance, including but not limited to private insurance under Title IX or Title XXI, and then it says, and for those evacuees receiving medical assistance under the project for the total uncompensated care costs incurred for medically necessary services and supplies. Beyond those included as medical assistance or child health, it goes on. Yes, Your Honor, if I may, that portion of the statute actually refers to the two separate programs from which I am discussing. So the first portion, which states, sorry, unfortunately I don't have the text of the DRA in front of me, but the first portion refers specifically to evacuees who do not have insurance or Medicaid, correct? The second portion states for affected individuals who are receiving care under the project. And the project is for these Hurricane Katrina evacuees. Well, so, Your Honor, affected individuals who are receiving care under the project refers to the first program that I referred to, the expansion waiver population, the people who were undoubtedly deemed eligible for Medicaid because the letters itself and the plan itself said women and children under a certain income limit are going to be eligible for Medicaid. They are receiving assistance under the project. And for that population, the money appropriated by Congress paid for care over and above what the state plans would ordinarily pay. But for the first population, the people who did not have insurance, it paid for all costs. And as you'll note, the key distinction in that statute is that for the people who do not have insurance, the term under the project is never used. These people are not receiving care under the project. These are simply costs that hospitals have incurred because there are people without insurance who have not paid. So you're saying that patients regarded as Medicaid eligible because of a demonstration project are excluded from the numerator? No, Your Honor. They should be included in the numerator regardless of whether it's the hospital. It's two separate ways you can be included. Yes, Your Honor. And the first way is if you are Medicaid eligible under the state plan prior to a waiver. And the second way is if you are considered regarded Medicaid eligible. Because, and the because is important. Of a demonstration project. Yes. The statute itself says because they are receiving benefits under a demonstration project, and the Secretary's regulations have reasonably stated that patient is only deemed eligible for Medicaid on a given day if they are eligible for inpatient hospital services. The uncompensated care pool does not create eligibility. Now that is not to say, Your Honor, that there could have been patients that were treated by these hospitals that were eligible for Medicaid under the waiver. Again, the waiver itself did expand the population that was entitled to eligibility. But that is a different thing. The hospitals at no point in these proceedings have stated, here are the people that we have treated that fell within the population that the letters said are now eligible for Medicaid. The Katrina waiver allows states to pay uncompensated care costs for evacuees who did not have other health care coverage. And then they can seek the reimbursement. I believe that the problem that we're having here, Your Honor, is that the plaintiff hospitals read the statute as if to say, all costs under Section 1115 are included in the dish adjustment. That is not what the statute says. The statute says that costs can be included, or sorry, patient days can be included in the dish statute if a patient is receiving benefits under the waiver. And again, the Secretary's regulations say only if the patient is eligible for inpatient hospital services under the waiver. Or under a waiver authorized under Section 1115A2 of the Act on that day. Yes, Your Honor. So it's a separate way you're eligible. Only if they are eligible for inpatient hospital services, dot, dot, dot, under a waiver authorized by Section 1115. Or, no, it says or under a waiver. So it's two ways. One is if they're a hospital, if they're eligible for Medicaid on a given day. And then the second way is or under a waiver authorized. Which you respectfully, Your Honor, there would be no verb there if the statute was read that way. It says or. Yes, Your Honor, and allow me to parse this, please. A patient is deemed eligible for Medicaid on a given day. Only if the patient is eligible for hospital services under an approved Medicaid plan or under a waiver. The eligible for inpatient hospital services modifies both approved state Medicaid plan or under a waiver. If it didn't, there would be no predicate clause there. It would simply say a patient is deemed eligible for Medicaid on a given day only under a waiver. That's simply not the appropriate way to read that regulation. The question is whether the patient is receiving hospital services, which it can do in two ways. It can receive it under the state Medicaid plan or it can receive them under a waiver. There's neither the statute nor the regulations say any costs attributable to a Section 1115 waiver are included in the DISH statute. Do you believe that we have to find some ambiguity and give you our deference for you to prevail today? Your Honor, I believe that the plain text of the statute and the regulations support the Secretary's interpretation here because, again, no patient here is receiving inpatient hospital services under the waiver. So you believe plain text, you win. But we still get deference for our reasonable interpretations of the statute. Only if it's ambiguous. If this Court found that it was ambiguous, this Court would have to determine that the plain text of both the regulations and the statute were against the Secretary in order to rule against us. Is that really true that we would have to find both? Because if you have discretion, but then you make a regulation that specifically lays it out, you've exercised your discretion. So the fact that you could have kept discretion to do something else doesn't mean that if we find that having discretion makes it ambiguous. You have to look at your clear regulation in the abstract. If the question is the interpretation of the regulation, then of course this Court also owes deference to the Secretary for their reasonable interpretations of their own regulation. Unless it's unambiguously the other way. And again, Your Honor, the only way that you could read this the way the plaintiffs have is if you ignore the fact that the regulation requires the patient to be eligible for inpatient hospital services. The regulation very plainly says that. Or it says or, and we can have that argument again, but we're not going to. Unless you wish to for some reason. I do want you to address Judge Jackson's opinion about the unambiguous regulation. So, Your Honor, I believe that Judge Jackson, there's a critical distinction between the facts at issue and Judge Jackson's opinion. Unfortunately, I was furloughed until last Monday and I was not able to file something in time. I'm happy to file something supplemental after this argument to address this. But I would also be happy to discuss this now. I believe Judge Jackson's opinion actually supports what I'm trying to say about this regulation here. Judge Jackson relies very heavily on the fact that she believes that patients in the DDC case were receiving benefits. They were getting premium assistance. They personally were receiving benefits and the plan itself allowed them to receive those benefits. That is not true here. The language creating the UCCP very specifically does not talk about patients at all. It does not make anyone eligible for anything. What it does is it creates a pool of money for hospitals to seek reimbursement from. Has the department appealed Judge Jackson's ruling? A notice of appeal has indeed been filed in that case, Your Honor. That is all I know currently about the status of that. I believe the appeal has been pending since December 21st, which I also know was the first day of the lapse in appropriation, so I imagine there was probably a delay. A notice of appeal, but no briefs yet as far as you know? No briefs yet as far as I know, Your Honor. I am sure that the Secretary will take a position as to whether Judge Jackson's interpretation was correct, but even under Judge Jackson's decision, Judge Jackson's decision, as I mentioned, further highlights exactly what I am trying to say here, which is that patients, in order to include something in the DISH adjustment, a patient has to be eligible for inpatient hospital services. They have to receive a benefit. Here we are discussing an entire population of people, many of whom, again, keep in mind that the statute is supposed to be designed to target low-income populations. If money is paid out under the UCCP, there is no income requirement. It is simply all the hospitals had to do to receive money under the UCCP is to attest that they had incurred care costs and that the patient they treated did not have insurance. They further had to specify that the patient had not paid, and of course they no longer were able to receive payment from any other source. That was also another attestation. So the key difference, Your Honors, between the people who were eligible for inpatient hospital services under Section 1115 and the money that the hospital sought from the UCCP is if you are eligible for inpatient hospital services, you will not get a bill. You don't expect to get a bill. But many of the uninsured patients for whom the hospital sought money from the UCCP had no reasonable expectation that they would not be billed. They did not receive benefits. They were not eligible for Medicaid, even under Section 1115. The hospitals reasonably could have sent these people a bill. I don't know with specifics with regards to how many people the hospitals did, but it's only after the hospitals haven't been paid that you could then seek money from the UCCP. Why in your brief do you say that the plain text of the regulation cuts your way? Your Honor, our entire first argument explains that in order to be included in the adjustment under both the statute and the Secretary's regulation, the patient has to be receiving a benefit. The patient has to be eligible for inpatient hospital services. The entire first section of our brief explains that for the Katrina demonstration, there was a group of people who would fall within this regulation. That group of people were the people who the Section 1115 projects very specifically said were deemed eligible for Medicaid and could receive services under Medicaid. Again, these were women and children with income limits up to 200% of the federal poverty level. That's over and above what normally is. This was a much wider group of people than would ordinarily be covered under the state plan, but they are now deemed eligible for Medicaid because they are receiving services under Medicaid under the Section 1115 waiver. But the UCCP does no such thing. It does not create any entitlement or eligibility for any person to any type of service whatsoever. All it does is provide money to hospitals who would otherwise not be able to continue functioning if they weren't getting paid for services from uninsured people. Why isn't it creating the entitlement to medical assistance under the project? Because it does not attach to any person. Those evacuees who don't have other coverage and don't have Medicaid otherwise. Because it does not say those evacuees, if it said something like those evacuees who do not have coverage or insurance are now eligible to receive services, that would be one thing. But what it says is that hospitals can seek reimbursement for uncompensated care costs for those patients who do not have insurance and are not otherwise covered. It says with respect to the evacuees who do not have other coverage, and then it lists the other types of coverage, for the total uncompensated care costs. And this is from the Deficit Reduction Act, Your Honor? Yes. So again, the Deficit Reduction Act, I think the key distinction to highlight here is for those evacuees who do not have other coverage, payment is authorized to the hospitals for their uncompensated care costs. And that is drawn in distinction for those evacuees and affected individuals who are receiving treatment under the demonstration project. Those evacuees and affected individuals who are receiving treatment under the demonstration project are those under the 200% federal poverty level. They are both under the demonstration project, 1A and B. 1A defines the demonstration project. 1A talks about people who were receiving health care under the project for the non-federal share based upon a Medicaid. And 1B discusses the receipt under the demonstration project of health care coverage by the evacuees. Yes, Your Honor. And again, the question is not whether there is money being paid out from a demonstration project. The question is whether someone is receiving services under the project and is eligible for services, eligible for some benefit. The Deficit Reduction Act does several things. The first thing that it did was it created, well, it's funding going to several different places, essentially. There is funding for those affected individuals and evacuees who do not have, to pay for uncompensated care costs for those who do not have insurance. Forgive me for getting you off track with 30 seconds to go. Jumping back to Judge Brown's opinion, you say it's, number one, factually distinguishable. She had different facts before her. But nonetheless, she still got it wrong. You're still appealing. Yes, Your Honor. I know that the Secretary and other attorneys from the Department of Justice are currently working on that case. Because it's appealed, I'm certain that they have reasons, and I don't want to jump ahead of what they have to say. If I were in charge of that case, the first thing that I would say as to why this is incorrect is paying premium assistance to people is not creating any eligibility for inpatient hospital services, which is what is required under the Secretary's regulation. And that, to me, would be a key reason why that decision would be wrong. How do we treat the letters from HHS that the hospitals rely on in this case? What level of deference, if any, do we accord to those? Well, Your Honor, the letters, I think, only underscore this point that there is, of course, a population under the waiver that is eligible for inpatient hospital services. The hospital is not asking for a disadjustment based on those people. The hospital is asking for a disadjustment based on the fact that it drew money from the uncompensated care pool. And the distinction in these letters that is drawn is key. I don't think you've answered my question at all. You wanted to characterize the letters, but I'm asking you what level of deference we are to give, if any, to those letters. The letters help provide substantial evidence for the Secretary's reasonable decision here, Your Honor. Okay. Thank you. We have your argument. You've saved time for rebuttal, Counsel. Counsel is much more organized than I am. I'm impressed. It's good to be organized at oral argument, if you can be. Very much so, Your Honor. The case really should be decided by what the Secretary says its own regulation means. What the Secretary said in 2000 in a response in the final rule is that days utilized under Section 1115 expansion waivers, waivers that expand the number of people eligible, will be included in the Medicaid portion. The days utilized under any approved Section 1115 expansion waiver in the future would be included in this calculation. Your Honor, if we listen to the Secretary in 2000, this becomes a very easy case. Unfortunately, the Secretary keeps saying over and over now that that's not what the regulation means. We don't think the Secretary is entitled to walk that back. Rebutting a couple of points, Your Honor, the uncompensated care pool payments were subject to audit. The letters said that they would be. This was not simply handing out free services. I heard counsel say, well, the hospitals could have sent a bill. They were getting addresses from people, Your Honor, who the addresses they gave didn't have houses there anymore. That is the kind of situation they were dealing with. The hospitals, there's no allegation anywhere at the hearing where testimony was put on, no allegation that the hospitals were derelict, or that they didn't do a good enough job, or that they didn't comply with the plan's strict requirements. They did what they were supposed to. I heard that counsel say that, well, they're not really providing services to people under this. These aren't special services they're getting because of the waiver, but they are.  Without the waiver, if you came in in an emergency, then they would have had to stabilize you. That would have been the only requirement. Instead, rather than turn people away, they had people come in and they gave them treatment for medically necessary conditions. Because the Secretary had told them, okay, there's a care pool and you are going to be paid back for providing these benefits to these people. Regarding the eligible, the Secretary has backed off two things from the briefs. Number one, no longer claiming that the care pool isn't under the waiver, which is a good thing. And has backed off the matching payments issue. Now the focus is on, well, but they weren't really eligible for inpatient hospital benefits. We don't see the distinction, Your Honor. The people came in, they received benefits, health care, and the hospitals were reimbursed. What do you make of opposing counsel's attempt to distinguish the case by Judge Brown? Well, I mean, obviously there are slightly different facts, but as far as Judge Brown, are we talking about the 28-J letter? Judge Jackson. Last October. Okay, thanks. Well, we don't understand the distinction. She says the plain language of the regulation unambiguously requires that all patient days attributable through a roughly equivalent authorized demonstration project. This was roughly equivalent. People came in, they got all the benefits under the Mississippi State Plan. Inpatient hospital benefits, there's no issue there. So we think that actually supports us. Your Honors, please hold the Secretary to what the Secretary has said the rule meant over and over again until this case came up. Thank you.